UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
ELIZABETH SIRACUSE,

**R E P O R T   A N D**
**RECOMMENDATION**

            Plaintiffs,

   -against-

07 CV 2205 (CBA)

ROMAN CATHOLIC DIOCESE
OF BROOKLYN, et al.

            Defendants.
-------------------------------------------------X

On May 31, 2007, plaintiff Elizabeth Siracuse filed this action against defendants Roman

Catholic Diocese of Brooklyn (the "Diocese") and the Program for the Development of Human

Potential (the "PDHP"), alleging violations of the Family and Medical Leave Act of 1993

("FMLA"), 29 U.S.C. §§ 2601 et. seq., and disability discrimination and retaliation pursuant to

Section 8-107(a) of the Administrative Code of the City of New York. On December 5, 2008,

defendants moved for summary judgment, denying plaintiff's claims of discrimination and

retaliation, contending that plaintiff's leave was not covered by the FMLA, and that defendants

did not interfere with plaintiff's FMLA rights.


## FACTUAL BACKGROUND

Defendant Diocese is an organization incorporated pursuant to New York State's Not-

For-Profit Corporations Law, and defendant PDHP is one of the programs operated by the

Diocese.[1] (Def.'s 56.1 Stmnt ¶¶ 1, 2; Pl.'s 56.1 Stmnt[2] ¶¶ 1, 2). PDHP provides drug, alcohol,

---

[1]By Stipulation of Voluntary Dismissal in Part, dated December 1, 2008, plaintiff agreed
to dismiss the action against defendant Diocese. Thus, the only remaining claims under

gambling and prevention services to the Catholic Schools in Brooklyn and Queens. (Def.'s 56.1 Stmnt ¶ 3; Pl.'s 56.1 Stmnt ¶ 3).

PDHP receives all of its funding from government sources, with the majority coming from the New York State Office of Alcoholism and Substance Abuse Services ("OASAS"). (Def.'s 56.1 Stmnt ¶ 18; Pl.'s 56.1 Stmnt ¶ 18). In 1999, PDHP formed the Reconnecting Youth Program (the "RY Program"), which is funded by OASAS, and which is an educational program aimed at students with a high risk of dropping out, truancy, or involvement with substance abuse. (Def.'s 56.1 Stmnt ¶¶ 19-20; Pl.'s 56.1 Stmnt ¶¶ 19-20).

PDHP employs prevention counselors who are social workers. (Def.'s 56.1 Stmnt ¶ 4; Pl.'s 56.1 Stmnt ¶ 4). Plaintiff, who was hired by PDHP in 1989, intitially had no Master's Degree in any clerical field, nor was she a certified teacher. (Def.'s 56.1 Stmnt ¶¶ 9-11; Pl.'s 56.1 Stmnt ¶¶ 9-11). Plaintiff subsequently obtained her Master's Degree in a clinical field during the course of her employment with PDHP. (Def.'s 56.1 Stmnt ¶ 12; Pl's. 56.1 Stmnt ¶ 12).

According to defendant, plaintiff was, at all relevant times, employed as a prevention counselor assigned to The Mary Lewis Academy ("TMLA") (Def.'s 56.1 Stmnt ¶ 13); plaintiff disputes this, claiming she was a substance abuse prevention counselor at TMLA. (Pl.'s 56.1 Stmnt ¶ 13). Plaintiff, who worked during the school year when school was in session, was

---

consideration in this motion are against defendant PDHP.

[2]Citations to "Def's. 56.1 Stmnt" refer to the Amended Statement of Material Facts by Defendant, dated January 20, 2009. Citations to "Pl.'s 56.1 Stmnt" refers to Plaintiff's Counter-Statement in Response to Defendants' Statement Pursuant to Local Civil Rule 56.1 and Plaintiff's Statement of Material Facts in Dispute, dated January 9, 2009.

responsible for providing prevention counseling and crisis counseling to students at TMLA either individually or in a group setting. (Def.'s 56.1 Stmnt ¶¶ 14-15; Pl.'s 56.1 Stmnt ¶¶ 14-15). Plaintiff's supervisor was Sonia McAuley. (Def.'s 56.1 Stmnt ¶ 28). During her employment at TMLA, plaintiff received good annual evaluations up until 2004. (Def.'s 56.1 Stmnt ¶ 16). Plaintiff disputes this statement, contending that she "consistently received excellent evaluations of her work performance." (Pl.'s 56.1 Stmnt ¶ 16).

The Executive Director of PDHP during the relevant time period was Eileen Dwyer ("Dwyer"), and the two Borough Directors who reported to Dwyer were Julia McEvoy, the Brooklyn director, and Judith Schiller-Rabi, the director of the program in Queens. (Def.'s 56.1 Stmnt ¶¶ 6-8; Pl.'s 56.1 Stmnt ¶¶ 6-8). Linda Babolcsay was the original supervisor of the RY Program and she was placed under the jurisdiction of the Brooklyn Borough Director, McEvoy. (Def.'s 56.1 Stmnt ¶¶ 23-24; Pl.'s 56.1 Stmnt ¶¶ 23-24).

According to defendant, in the spring of 2004, McEvoy began to question Babolcsay's efficiency and her relationship with the students, indicating that there were concerns about whether there was enough work to justify Babolcsay's full time supervisory position. (Def.'s 56.1 Stmnt ¶ 25). Defendant contends that Dwyer had concerns in June 2004 regarding possible funding cuts by OASAS and she wanted to give an annual raise to the staff. (Id. ¶ 30). Following an incident in late May 2004, Babolcsay resigned as of June 1, 2004. (Id. ¶ 26; Pl.'s 56.1 Stmnt ¶ 26).

Defendant contends that after Babolcsay resigned, McEvoy decided to reconfigure the RY Program by eliminating Babolcsay's position and reassigning her former duties to McAuley, plaintiff's supervisor, who had a Master's Degree in a clinical field, and to Ellen Fitzpatrick, a

3

certified teacher employed by PDHP, who had 25 years of teaching experience. (Def.'s 56.1 Stmnt ¶¶ 11, 27-29). According to defendant, no person was hired for Babolcsay's position and after the reconfiguration, there was one less employee in the RY Program. (Id. ¶¶ 37-38). The RY Program Budget for the 2004-05 school year reflects the elimination of Babolcsay's position and the 2004/05 PDHP Budget shows that all employees, including plaintiff, received a raise. (Id. ¶¶ 31-32).

Plaintiff disputes many of these statements. She claims that as soon as she heard that the Babolcsay position was vacant, she expressed her interest in the job. (Pl.'s 56.1 Stmnt ¶ 27). She contends that McEvoy told her that her interest in the job would be discussed with other PDHP officials. (Id.) Plaintiff claims that she was not told that she had not received the job until June 11, 2004, when she spoke to Schiller-Rabi. (Id.) Plaintiff also denies that McEvoy and Dwyer reconfigured the RY Program to eliminate the supervisory position previously held by Babolcsay, contending instead that they simply reassigned her duties to Fitzpatrick, who became the functional supervisor of the RY Program. (Id.) Plaintiff also disputes defendant's claim that McAuley took over Babolcsay's duties. (Id. ¶¶ 28-29, 31).

Although defendant concedes that plaintiff expressed an interest in Babolcsay's position, PDHP asserts that plaintiff inquired about the job with McAuley in the first week of June 2004 (Def.'s 56.1 Stmnt ¶ 33), while plaintiff believes that her inquiry may have been in late May. (Pl.'s 56.1 Stmnt ¶ 33). Defendant also contends, and plaintiff does not dispute, that PDHP had a policy of posting available positions and this job was never posted as open. (Def.'s 56.1 Stmnt ¶ ¶ 35-36; Pl.'s 56.1 Stmnt ¶¶ 35-36).

Following a trip in the summer of 2003, plaintiff was diagnosed with Hodgkins

Lymphoma and was required to undergo chemotherapy and radiation treatments. (Def.'s 56.1 Stmnt ¶ 40; Pl.'s 56.1 Stmnt ¶ 41;[3] Pl.'s Mem.[4] at 1). Thereafter, plaintiff was absent for 63.5 days of the 2003/04 school year (Def.'s 56.1 Stmnt ¶ 41), although plaintiff contends that seven of those days were vacation days. (Pl.'s 56.1 Stmnt ¶ 42). In January 2004, plaintiff was allowed to work from home as an accommodation and beginning at the end of May and continuing through June 2004, she was allowed to work a reduced work week schedule, pursuant to her doctor's request due to fatigue. (Def.'s 56.1 Stmnt ¶¶ 42-43). Plaintiff disputes this assertion, contending that she agreed to work a three-day week at Dwyer's request. (Pl.'s 56.1 Stmnt ¶ 44).

Plaintiff contends that when she spoke to McEvoy about the Babolcsay job, McEvoy stated that plaintiff would be "'perfect'" for it but that it might not be the best time to make such a change given plaintiff's health. (Pl.'s 56.1 Stmnt ¶ 1). Plaintiff further claims that when Schiller-Rabi informed plaintiff that she had not been selected for the position, Schiller-Rabi also expressed the view that this was not a good year for plaintiff to change positions; that it was better that she remain in an environment where people knew her and were aware of her health issues in case she needed to take time off. (Id. ¶ 2). On June 12, 2004, the day after Schiller-Rabi informed plaintiff that she was not getting the position, McEvoy is alleged to have told plaintiff that her health was not the "only" factor they had considered and she stated that they had decided to revamp the position when Babolcsay resigned. (Id. ¶ 3).

------

[3]It appears from the plaintiff's response to ¶ 41 of Defendant's 56.1 Statement that the plaintiff's responses do not correspond with the numbers in the defendant's 56.1 Statement. Beginning with plaintiff's ¶ 40, all responses thereafter are one paragraph off, with plaintiff's ¶ 41 actually responding to defendant's ¶ 40 and so on.

[4]Citations to "Pl.'s Mem." refer to the Memorandum of Law of Plaintiff in Opposition to Defendant's Motion for Summary Judgment, dated January 9, 2009.

Plaintiff disputes defendant's claim that the job was eliminated or reconfigured, contending that the job was given to Fitzpatrick despite the fact that Fitzpatrick did not have a Master's Degree, which was a job requirement for the position. (Id. ¶ 5). Plaintiff further claims that when she spoke to Dwyer in late June 2004, Dwyer "made many transparent excuses for her decision" and did not state that McAuley would be taking over Babolcsay's functions. (Id. ¶ 6). Indeed, plaintiff disputes that McAuley in fact assumed these functions but claims instead that the job was given to Fitzpatrick, who plaintiff claims was not qualified. (Id. ¶¶ 7-8).

Defendant moves for summary judgment contending that: 1) PDHP did not violate plaintiff's rights under the FMLA; 2) plaintiff cannot demonstrate that PDHP retaliated against her for availing herself of FMLA leave; and 3) her remaining claims under the Administrative Code of the City of New York should be dismissed for the same reasons.

## DISCUSSION

### A. Summary Judgment Standards

It is well-settled that a party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990). Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, see Egelston v. State Univ. Coll. at Geneseo, 535 F.2d 752, 754 (2d Cir. 1976); Gibralter v. City of New York, 612 F. Supp. 125, 133-34 (E.D.N.Y. 1985) (stating that summary judgment "is a drastic remedy and should be applied sparingly"), the Court should not grant

summary judgment unless "it is quite clear what the truth is [and] that no genuine issue remains for trial." Auletta v. Tully, 576 F. Supp. 191, 195 (N.D.N.Y. 1983) (internal quotation marks and citations omitted), aff'd, 732 F.2d 142 (2d Cir. 1984). In addition, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999) (stating that "[w]hen considering a motion for summary judgment the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party").

Once the moving party discharges its burden of proof under Rule 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 858 (S.D.N.Y. 1991) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48 (emphasis in original). Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. Id. at 248 (internal citation omitted).

B.   The Family Medical Leave Act of 1993

Plaintiff claims that she was entitled to receive FMLA leave and that defendant, in

denying her a promotion, discriminated against her and retaliated against her for exercising her FMLA rights.

1) Standards

The FMLA was enacted "to entitle employees to take reasonable leave for medical reasons . . . for the care of a child, spouse or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2). The Act provides job security for employees who have "serious health conditions that prevent them from working for temporary periods." Id. § 2601(a)(4). Under the Act, an employee is entitled to take a total of twelve workweeks of leave during any twelve month period, for health related reasons, id. § 2612(a)(1)(D), and upon returning from such leave, the employee is entitled to be restored to his position or an equivalent position. Id. § 2614(a)(1). The FMLA prohibits an employer from interfering with an employee's exercise of her rights under the Act, id. § 2615(a)(1), and from discharging or in any other manner discriminating against an individual for opposing any practice made unlawful by this subchapter. Id. § 2615(a)(2). Any eligible employee who was wrongfully denied benefits under the Act or who faced retaliation because of the exercise of her rights under the Act is authorized to bring a private action against the employer under the FMLA. See id. §§ 2611, 2615; 29 C.F.R. § 825.220 (stating that "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions").

In her Complaint, plaintiff has alleged two separate causes of action under the FMLA: 1) interference with the exercise of her FMLA rights under 29 U.S.C. § 2615(a)(1), and 2) retaliation for exercising her FMLA rights. Id. at § 2615(a)(2).

Interference claims are appropriate when "the employer in some manner impeded the employee's exercise of his or her right[s] afforded substantive protection under the FMLA." Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 176 (2d Cir. 2006) (citing King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999)). A plaintiff bears the burden of establishing only a prima facie case for interference claims, and the court need not consider the issue of the employer's intent. Id. In order to establish a prima facie case of interference with plaintiff's exercise of FMLA rights, plaintiff must establish that: 1) she is an eligible employee; 2) defendant qualifies as an employer under the FMLA; 3) plaintiff was entitled to take leave under the FMLA; 4) plaintiff gave notice to defendants of her intention to take leave; and 5) defendants denied plaintiff the benefit to which she was entitled under the FMLA. See Brown v. Pension Bds., 488 F. Supp. 2d 395, 408 (S.D.N.Y. 2007).

In order to establish a prima facie case of retaliation under the FMLA, plaintiff must show that 1) she exercised rights protected by the FMLA; 2) she was qualified for the position; and 3) she suffered an adverse employment action; 4) under circumstances giving rise to an inference of retaliatory intent. See Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004). In analyzing claims of retaliation under the FMLA, the Second Circuit has explicitly adopted the McDonnell Douglas analysis used in Title VII cases. Id.; see also Aulicino v. N.Y. City Dept. Of Homeless Servs., No. 06-5605-CV, slip-op at 12 (2d Cir. Sept 8, 2009); Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008). For plaintiff to prevail on her claim that defendant rejected her bid for a promotion because of her need to take FMLA leave, she must show that she "was rejected under circumstances which give rise to an inference of unlawful discrimination." Aulicino v. N.Y. City Dept. Of Homeless Servs., No. 06-5605-CV, slip-op at 12 (quoting Brown

9

v. Coach Stores Inc. 163 F.3d 706, 710 (2d Cir. 1998)).

## 2) Analysis

For purposes of this motion, the parties do not dispute that PDHP is a covered employer under 29 U.S.C. § 2611(4)(A)(i) or that plaintiff is an eligible employee as defined by the statute. The parties also agree that during the 2003-2004 school year, plaintiff was required to take sick days and several short leaves of absence while undergoing treatment for Hodgkin's Lymphoma.

### a) Coverage Under the FMLA

Defendant, however, argues that because plaintiff has consistently taken the position that she was at all times able to perform the functions of her position and that she performed her counseling duties from home just as effectively as if she had been there in person, she was not subject to the FMLA and cannot make any claims under the Act. Specifically, defendant cites to subsection (D) of 29 U.S.C. § 2612(A)(1) which addresses an employee's entitlement to FMLA leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." Although defendant concedes that as an accommodation, it granted all of plaintiff's requests for leave and allowed her to telecommute, any leave she was given beyond her allotted sick days was "done solely at Defendant's good will and discretion." (Def's. Mem. at 5). Defendant argues that if, as plaintiff asserts, she was able to perform her job from home, then she did not qualify under this provision to receive FMLA leave. (Id.) From this proposition, defendant argues that if plaintiff was not entitled to receive FMLA leave, she has no legal basis on which to claim that defendant interfered with her rights or

10

retaliated against her. (Id. at 3-5).

Plaintiff responds by noting that even though she managed to perform the essential functions of her job despite her illness, on most days that she took leave from work, she was temporarily disabled and could not work on those days. (Pl.'s Mem. at 8). Since the FMLA is designed to protect employees who are temporarily unable to perform their job functions and specifically provides for intermittent leave, 29 C.F.R. § 825.203, plaintiff argues that she was clearly eligible for FMLA leave. Id. The fact that, at the conclusion of each leave period, she was able to return to her job and function, does not preclude her FMLA claims. Indeed, if after taking FMLA medical leave, an employee is unable to return to work, there is no obligation for an employer to keep the job open. See Roberts v. Ground Handling, Inc., 499 F. Supp. 2d 340, 351 (S.D.N.Y. 2007); see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 161 (2d Cir. 1999) (ruling that there was no FMLA violation where plaintiff was still unable to perform his job function at the conclusion of his FMLA leave period).

Plaintiff argues that regardless of what label defendants have used to characterize her leave time, it is undisputed that she took intermittent leave for medical reasons during the 2003-2004 school year. (Pl.'s Mem. at 10). The Court agrees. Nothing in the statute or the cases cited by defendant suggests that the fact that an employee is absent on an intermittent basis and then returns to work, capable of functioning in her job title, whether with or without an accommodation, removes them from the protection of the FMLA. As plaintiff notes, this ability to take time off to deal with one's own illness or with the illness of a parent or child was the purpose behind the enactment of the FMLA. To now suggest that plaintiff cannot sustain a claim under the FMLA because plaintiff was able to return to work after taking medical leave would

defeat the purpose of the FMLA.

b) Plaintiff's Claim of Interference with Her FMLA Rights

In her Complaint, plaintiff alleges as her First Cause of Action that "[b]y failing to promote Plaintiff to a position for which she was qualified because she had taken medical leave and might again request a medical leave, Defendants wilfully interfered with Plaintiff's exercise of her right to take leave covered by the FMLA, in violation of 29 U.S.C. 2615(a)(1)."

As an initial matter, it is clear that plaintiff is not asserting in this interference claim that defendants denied her any requested FMLA leave. Defendant argues that the leave plaintiff was given was not FMLA leave, but rather was leave given solely at defendant's discretion and out of good will. Regardless of how the leave is characterized, plaintiff was afforded ample leave time during the period of her convalescence. She does not articulate in her Complaint or in her response to the current motion for summary judgment in what way defendant interfered with her rights other than in denying her the requested promotion, which is the basis for her claim of retaliation.

As noted by the plaintiff, the McDonnell-Douglas burden shifting approach may not apply in interference claims under the FMLA. (Pl.'s Mem. at 19). However, since the plaintiff has not established a prima facie claim of interference, there is no need to determine whether burden-shifting should apply in this case. An interference claim requires proof that plaintiff gave notice of her intent to take leave and that defendant denied her the benefit to which she was entitled under the law. See Brown v. Pension Bds., 488 F. Supp. 2d at 408. Given that the denial of the promotion occurred after she had taken the leave, it is unclear in what way defendants

12

"interfered with" or impeded the exercise of her rights under the FMLA. Since the claim seems more properly considered within the rubric of her retaliation claim – namely, that because she took leave, defendant denied her the promotion – the Court has considered the claim in that context.

Accordingly, since plaintiff does not assert that she was denied any requested FMLA leave and has not articulated any other basis for finding interference with her rights, the Court respectfully recommends that summary judgment in favor of defendant be granted on plaintiff's interference claim under 29 U.S.C. § 2615(a)(1).

### (c) Plaintiff's Retaliation Claim

In pursuing her claim of retaliation against defendant, the plaintiff, having established that she exercised rights protected by the FMLA, must also demonstrate that she was qualified for the position that she sought and that she suffered an adverse employment action under circumstances giving rise to an inference of retaliatory intent.

### (i) Qualified for the Position Sought

In this case, plaintiff alleges that by speaking to Julia McEvoy, the Borough Director of the Brooklyn office, she applied for the job position vacated by Linda Babolcsay, and that she discussed with McEvoy plaintiff's interest in the position at some length. (Pl.'s Mem. at 10; Pl.'s Dep. at 134-136). Plaintiff asserts that she was "highly qualified" for Babolcsay's position because she had 16 years of experience as a substance abuse prevention counselor; she had consistently received excellent job performance evaluations and even though she was not a

certified teacher,[5] she had attended numerous training programs and was qualified to handle the teaching aspects of the RY Program. (Pl.'s Mem. at 11). As further evidence that she was qualified for the position sought, plaintiff contends that in 1998, when the RY Program was initially being planned, Ms. McEvoy offered plaintiff this supervisory position subject to plaintiff's agreement to enroll in a Master's Degree program. (Pl.'s Decl. ¶ 7). Although plaintiff was unable at that time to attend graduate school and was therefore forced to decline the position, she subsequently obtained her Master's Degree. (Id. ¶ 8). She argues that it seems unlikely that six years later, with additional experience and a Master's degree, she had "became less qualified for the position." (Pl's. Mem. at 12).

Defendant disputes plaintiff's claim that she was "qualified," citing 29 C.F.R. § 825.123(a). This regulation states that "an employee who must be absent from work to receive medical treatment for a serious health condition is considered to be unable to perform the essential functions of the position during the absence for treatment." Id. Defendant questions how it is possible that during this same period that plaintiff was taking medical leave, she could be qualified for the job promotion. Defendant argues that plaintiff was not able to assume a "better" and presumably more difficult supervisory position in June 2004 when, according to defendant, plaintiff's doctor requested that the plaintiff receive "reduced leave" on May 24, 2004. (Def.'s Mem. at 9).

_____

[5]Plaintiff notes that defendant's program materials describing the RY program do not require its staff or supervisor to have a teaching certificate. (Pl.'s Mem. at 11 (citing Ex. O to Cea Decl.).

14

Apart from the fact that there appears to be an error with regards to this May date,[6] defendant's argument is based on the same erroneous assumptions about the FMLA that the Court has previously rejected with respect to defendant's claim that plaintiff was not covered by the Act. (See discussion supra at 10-11). Indeed, this argument suggests, contrary to defendant's earlier position, that plaintiff was in fact not capable of performing her job functions due to her illness. While there may be an issue as to whether the plaintiff's condition in June meant that she was incapable of performing the responsibilities of the Babolcsay position, this is a question of fact in dispute and defendant's erroneous assertion that in May, plaintiff's doctor requested "reduced leave" does not, even if true, demonstrate as a matter of law that plaintiff was not qualified for the position. Furthermore, no evidence has been submitted that the doctor made such a request in May.

### (ii)  Adverse Employment Action and Inference of Retaliatory Intent

Having established a prima facie case as to the first two prongs for a claim of retaliation under the FMLA by showing that she exercised rights protected by the FMLA and was qualified for the position sought, plaintiff must still demonstrate that she suffered an adverse employment action under circumstances giving rise to an inference of retaliatory intent. Here, plaintiff claims

---

[6]Based on the evidence submitted to this Court, there is no letter from plaintiff's doctor dated May 24, 2004 or at any time in May. Instead, there is a letter requesting reduced leave from Dr. Owen O'Connor, plaintiff's physician, dated June 24, 2004 (Cea Decl. Ex. Z), which was submitted *after* plaintiff's promotion request had been denied and is irrelevant to the question of plaintiff's qualifications at the time she sought the promotion. There is also a much earlier request sent on January 22, 2004, six months before she sought the promotion, which does not seem relevant either. (Cea Decl. Ex. V).

that the adverse employment action was defendant's failure to promote her to the Babolcsay position, instead giving it to someone who plaintiff contends was less qualified than she. Failure to promote qualifies as an adverse employment action. Anderson v. Nassau County Dep't of Corr., 558 F. Supp. 2d 283, 302 (E.D.N.Y. 2008); Merli v. Bill Commc'ns, No. 01 CV 0359, 2002 WL 424649 at *6 (S.D.N.Y. March 18, 2002). In seeking to pursue a failure to promote claim under the McDonnell Douglas burden shifting test, plaintiff must show that she was rejected under circumstances giving rise to an inference of discrimination. Potenza v. City of New York, 365 F.3d at 168; Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000).

Plaintiff points to statements made during the June 11, 2004 meeting that she attended with Ms. Schiller-Rabi to support her contention that she was denied the promotion in retaliation for her having taken FMLA leave in the prior year. (Pl.'s Mem. at 12). Specifically, plaintiff claims that at that June 11th meeting, she was informed that she was being denied the promotion to a supervisory position and was told that Ellen Fitzpatrick had received the position. (Id.) According to plaintiff, Ms. Fitzpatrick had fewer years of employment at PDHP and did not have a Master's degree, which plaintiff contends was a requirement of the original RY Program proposal and had in practice been followed by the Program in the past. (Id. at 12-13). When plaintiff inquired why PDHP had hired someone less qualified for the position, she was told by Schiller-Rabi that it "was not a good year for a change for plaintiff." (Id. at 12). She suggested that plaintiff should be working in an environment where people knew her and were familiar with her heath concerns in the event plaintiff needed time off. (Id.) Viewing the record in the light most favorable to the plaintiff, see Aulicino v. N.Y. City Dept. Of Homeless Servs., No. 06-5605-CV, slip-op at 14 (citing Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008)),

16

these comments, if credited, could lead a jury to conclude that plaintiff was denied the promotion to this position due to concerns about her health and her need to take additional leave to deal with her medical issues.

Given the evidence presented, the Court finds that plaintiff has adequately set forth a prima facie claim of discrimination and retaliation based on the exercise of her FMLA rights.

### d)  Rational Non-Discriminatory Business Explanation

Under the McDonnel Douglas burden shifting test, defendant correctly notes that even if plaintiff can establish a prima facie case with respect to the first two prongs of the test, PDHP has a legitimate non-discriminatory explanation that rebuts plaintiff's claims of discrimination. See Texas Dep't of County Affairs v. Burdine, 450 U.S. 248, 256 (1981). Specifically, PDHP contends that when Babolcsay resigned, PDHP made the decision to restructure the program and to eliminate this supervisory position both for fiscal reasons and because it wanted "to have a teacher coordinate the day to day activities of the RY Program." (Def.'s Mem. at 10). Defendant contends that the position was never posted or offered and that although plaintiff believes her inquiries into the position constituted an application and interview, in reality, the job was never made available to anyone because the position was eliminated. (Id.) According to defendant, McEvoy had doubts about the need for the position months before Babolcsay resigned and her resignation provided the opportunity to effect the change. (Id.)

Defendant cites as further support the fact that the Board of Education had warned Dwyer during the 2003-2004 school year that due to budget cuts, funding for the PDHP programs may be reduced as a potential cost-saving measure. (Id.) Thus, Dwyer and McEvoy were looking for

17

ways to reduce spending and the elimination of the position was considered. In addition, by reallocating the responsibilities to McAuley and Fitzpatrick, "a regional coordinator with clinical credentials and a certified teacher . . . with more than 25 years of teaching experience," Dwyer was able to "drive the Program toward a more teacher-based curriculum." (Id. at 11). Defendant contends that the documentary evidence further supports its argument that the position was eliminated for rational legitimate non-discriminatory reasons and the burden shifts to plaintiff to demonstrate that the reasons proffered are "pretextual." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 512 (1993) (holding that to show pretext plaintiff must demonstrate "both that the [business] reason was false and that discrimination was the real reason").


e) Pretext

In attempting to demonstrate pretext, plaintiff disputes defendant's claim that the position was eliminated and reconfigured. Specifically, plaintiff cites testimony of one of the RY Program counselors, Anna Steegman, that Fitzpatrick became her supervisor after Babolcsay and that Fitzpatrick signed a letter of recommendation on Steegman's behalf using the title "Supervisor." (Steegman Decl. ¶¶ 3-4). Regardless of the parameters of the position, plaintiff argues that Fitzpatrick was promoted to a supervisory position instead of plaintiff and that Schiller-Rabi, Borough Director of the PDHP Queens Field Office, explicitly told plaintiff that she was not being given the job due to her health. (Pl.'s Mem. at 12). Plaintiff also asserts that Dwyer later told her that Fitzpatrick's new position did not pay much more than plaintiff's and that plaintiff "would not be challenged by the job given to Ellen Fitzpatrick." (Id. at 14). Dwyer offered other explanations, suggesting that the principal of TMLA would not want the program

18

run from her school and that plaintiff had no training in the RY Program. (Id.) When plaintiff challenged these explanations, Dwyer responded that "it was too late, the decision was already made and could not be changed. (Id. at 14).

Plaintiff also disputes defendant's assertion that budgetary considerations were what motivated the decision. Plaintiff contends that she would have assumed the job responsibilities given to McAuley and eliminated the need to hire a new staff member, thus effecting a similar savings. (Id. at 14-15).

Defendant contends that plaintiff has offered no evidence to suggest that the business plan to eliminate Babolcsay's position was in any way false or without merit. (Def.'s Mem. at 12). The timing of the decision to reconfigure spanned a total of three weeks, indicating that it was not a scam or pretext and to date, over three plus years later, the position has not been revived. Defendant contends that the FMLA was not intended to shield employees from all legitimate business decisions that result in negative consequences to their employment such as the elimination of the position here. See Geromanos v. Columbia Univ., 322 F. Supp. 2d 420, 428 (S.D.N.Y. 2004); see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F. 3d at 161.

Although defendant's business plan may be legitimate, plaintiff argues that to sustain her claim, she need only show that discrimination was a motivating factor in the decision, even if defendant's proffered explanation is also credible. See Desert Palace, Inc. v. Costa, 539 U.S. 90, 98 (2003); Fields v. N.Y.S. Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 120 (2d Cir. 1997). In this case, plaintiff has proffered a number of statements from McEvoy and Schiller-Rabi that could be perceived as discriminatory: 1) McEvoy's statement that plaintiff would be "'perfect for the job'" but it might not be the best time to change jobs,

referring to plaintiff's health (Pl.'s Mem. at 16); 2) McEvoy's statement that plaintiff's health had not been the "'only'" factor considered (id. at 17); 3) Schiller-Rabi's comments that she knew plaintiff was qualified but that it "was not a good year for change for plaintiff" and that she should be in an environment where people knew about her health issues (id. at 16); 4) Schiller-Rabi's deposition testimony confirming that plaintiff's health had been discussed in connection with the job vacancy (Dep. of Schiller-Rabi, Feb. 11, 2008, at 50-52); and 5) Sonia McAuley's testimony during deposition that Schiller-Rabi had expressed concerns to Dwyer about plaintiff's health. (Dep. of McAuley, Feb. 12, 2008, at 46).

Although defendant contends that Dwyer made the decision to eliminate the position, plaintiff alleges that the bias demonstrated by McEvoy and Schiller-Rabi was imparted to Dwyer and the record makes it clear that both McEvoy and Schiller-Rabi had input into the decision-making process. Where a person had "substantial input in the decision-making process," courts have held that a jury may infer discrimination from comments made by those individuals. Weber v. Parfums Givency, Inc., 49 F. Supp. 2d 343, 361 (S.D.N.Y. 1999); see also Azar v. TGI Friday's Inc., 945 F. Supp. 485, 499 (E.D.N.Y. 1996) (finding that comments made by plaintiff's supervisor who regularly conferred with decision-maker constituted direct evidence of discriminatory intent).

Given the evidence of statements referencing plaintiff's health and the leave time taken in the year prior to the elimination of the Babolscay position, and drawing all inferences in plaintiff's favor as required, see Aulicino v. N.Y. City Dept. Of Homeless Servs., No. 06-5605-CV, slip-op at 20, the Court finds that there are material issues of fact in dispute that preclude granting defendant's motion for summary judgment at this time.

C. New York City Administrative Code Claims

Plaintiff also asserts that in failing to promote her, defendant violated Section 8-107(a) of the New York City Administrative Code ("Code") which prohibits disability discrimination and retaliation. Given that the plaintiff has sufficiently alleged a violation of the federal FMLA, the Court has jurisdiction to consider these related claims under local law. 28 U.S.C. § 1367(a).

Under the Code, employers are prohibited from retaliating or discriminating in any manner against employees who suffer from a disability. N.Y.C. Admin. Code § 8-107(7). Plaintiff asserts that when she developed Hodgkins Lymphoma and underwent treatment with its consequential effects on her immune system, she qualified as "disabled" under § 8-102(16) of the NYC Administrative Code. Even though she ultimately went into remission and recovered, defendant's concerns that her disease and her symptoms would cause her to need additional time off and the resulting decision not to promote her are sufficient facts for a jury to determine that disability discrimination occurred in violation of the Code.

With respect to plaintiff's claims under the Code, defendant correctly asserts that the same burden-shifting analysis applies. Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (applying McDonnell-Douglas burden-shifting analysis to claims under NYC Admin. Code). Thus, defendant contends that because it has set forth a legitimate, non-discriminatory business reason for its decision, plaintiff's claim under the Code must be dismissed.

For the reasons stated with respect to plaintiff's FMLA claims, the Court finds there are material issues of fact in dispute that preclude summary judgment on plaintiff's claims under the City Administrative Code and respectfully recommends that defendant's motion for summary

judgment as to plaintiff's FMLA retaliation claim and as to her claim under the Administrative Code be denied.

## CONCLUSION

Accordingly, it is respectfully recommended that defendant's motion for summary judgment be denied as to the claims by plaintiff for retaliation under the FMLA and the New York City Administrative Code 8-107(a), while summary judgment should be granted to defendant as to plaintiff's claim for interference under the FMLA.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(d), 72; Small v. Secretary of Health & Human Servs., 892 F. 2d 14, 15 (2d Cir. 1989).

The clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
September 15, 2009

Cheryl L. Pollak
United States Magistrate Judge