Marc J. Monte, Attorney at Law (MM-0463)
Wingate, Kearney & Cullen, LLP
45 Main Street, Suite 1020
Brooklyn, New York 11201
Tel. 718-852-5900—Fax 718-852-8168

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ELIZABETH SIRACUSE,

        Plaintiff,

- against -

ROMAN CATHOLIC DIOCESE OF BROOKLYN and
PROGRAM FOR THE DEVELOPMENT OF
HUMAN POTENTIAL,

        Defendants

Index No. 07cv2205(CLP)

**MEMORANDUM OF LAW**

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendant, The Department of Education, Diocese of Brooklyn s/h/a "Program for the Development of Human Potential" ("PDHP"), submits this Memorandum of Law in support of its Motion for Judgment as a Matter of Law Pursuant to FRCP 50.

## QUESTION PRESENTED

1.    Must the Court set aside the jury verdict for the Plaintiff herein where the Plaintiff has not established a legally sufficient evidentiary basis for a reasonable jury to find for Plaintiff?

    Answer:    Yes.

# STANDARD FOR SETTING ASIDE VERDICT UNDER FRCP 50

The within motion seeks, pursuant to FRCP Rule 50(b), to set aside that portion of the verdict entered May 4, 2011 after trial by jury pertaining to disability discrimination under New York City Human Rights Law and directing judgment thereupon for the Defendant. FRCP 50(b) reads as follows:

> (b) Renewing the Motion After Trial; Alternative Motion for a New Trial. If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:
> (1) allow judgment on the verdict, if the jury returned a verdict;
> (2) order a new trial; or
> (3) direct the entry of judgment as a matter of law.

A Rule 50 motion should only be granted when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on a particular issue, and such judgment may be granted even after a jury has returned a verdict. Per the Southern District in <u>Obabueki v. Choicepoint, Inc.</u>, 236 F. Supp. 2d 278 (SDNY 2002):

> In ruling on a motion for judgment as a matter of law, trial courts are required to consider the evidence in the light most favorable to the nonmovant and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. See <u>Tolbert v. Queens College, 242 F.3d 58, 70 (2d Cir. 2001)</u>. The Court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. <u>Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 367 (2d Cir. 1988)</u> (internal quotation marks omitted); see also <u>Kim v. Hurston, 182 F.3d 113, 117 (2d Cir. 1999)</u>; Piesco

v. Koch, 12 F.3d 332, 343 (2d Cir.1993). In making its evaluation, the Court should "review all of the evidence in the record," Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000), but it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the Court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses. Id. (internal quotation marks omitted).

## PRELIMINARY STATEMENT

The Defendant respectfully submits that the Plaintiff failed to produce at trial any document or testimony sufficient to provide an evidentiary basis from which a reasonable jury could find that an RY Supervisor position existed at the time of the events at issue. As it did not exist, the Defendant could not discriminate against Plaintiff by denying her the position.

Item number three on the Jury Verdict Form asked:

> Has the plaintiff established, by a preponderance of the evidence that the defendant failed to promote her to an RY Supervisor position that existed at that time?

The jury responded "yes" to this question. However, a review of the trial transcript reveals that no evidence to support this response by the jury. The most compelling proof is Plaintiff's own testimony, in which she concedes the elimination of the RY Supervisor position occupied by Linda Babolcsay and the statistical unconverted evidence that PDHP had one less employee after Babolcsay resigned. To avoid this obvious admission, Plaintiff testified that she could have performed the position at The Mary Louis Academy where the Plaintiff was working as a counselor. In doing so, Plaintiff argued that Plaintiff could have been accommodated by PDHP creating a new position for her. Plaintiff's Complaint does not plead such nor did she offer any evidence that she ever requested this accommodation or this new position. Therefore,

3

the juries reliance upon such is without a reasonable basis. As such, Plaintiff failed to produce a legally sufficient evidentiary basis for a reasonable jury to find that <u>an RY Supervisor position existed at the time of Plaintiff's demand</u>.

It requires noting that the language employed in item number three on the Jury Verdict Form had previously included "additional responsibilities" along with "RY Supervisor position". This phrase was affirmatively deleted without objection by the Plaintiff and expresses the clear intent that the jury determine whether the RY Supervisor position as it was constituted in May and early June existed at the time the Plaintiff demanded it. Based upon the following, it is respectfully submitted that the position did not exist at that time and that the jury's decision on item number three on the Jury Verdict Form and the finding under the New York City Human Rights Law be set aside.

## POINT I

### PLAINTIFF HAS FAILED TO PRODUCE A LEGALLY SUFFICIENT EVIDENTIARY BASIS FOR A REASONABLE JURY TO FIND THAT AN RY SUPERVISOR POSITION EXISTED AT THE TIME OF THE EVENTS AT ISSUE

A.  **Evidence Presented at Trial**

1.  **The position for which Plaintiff allegedly applied was that of the RY Supervisor at Christ the King High School which had been held by Linda Babolcsay until her resignation on June 1, 2004.**

At <u>114:21-24</u>[1], Plaintiff testifies that it is specifically Linda Babolcsay's position she was seeking, rather than an alternative position that could have been constituted at TMLA:

> Q   What did you do when you found out that Ms. Babolcsay was leaving PDHP?

---

[1] Reference to the trial transcription will be made in this underlined format, identifying page number, colon, then line numbers.

4

> A  Well, I immediately told my supervisor Sonia McAuley that I was interested in applying for that position.

At 415:18-25; 416:1-8, on re-cross examination, the Plaintiff fails to identify the job options spoken about at length as positions she applied for at the time of her demand for promotion and that she had no knowledge of the defendant's budget planning procedures or concerns.

At 89:4-25; 90:1-25; 91:1-12, Sonia McAuley testified on direct examination that the Plaintiff had approached her specifically about Linda Babolcsay's vacated RY Supervisor position at Christ the King.

**2. The position of RY Supervisor at Christ the King High School was under review for elimination prior to Linda Babolcsay's resignation on June 1, 2004 and was eliminated on or about June 9, 2004.**

At 305:1-9, Plaintiff admits the RY position she was applying for had been eliminated:

> Q  Are you aware of the time when PDHP eliminated its RY position at Christ the King High School?
> A  Am I aware of the time they did that?
> Q  Of a time.
> A  When they stopped having an RY counselor at that school?
> Q  Yes.
> A  Yes.
> Q  Okay. When was that?
> A  They didn't -- after Linda was fired --

At 306:3-6 and 15-19, Plaintiff fails to attribute PDHP's action in eliminating the RY Supervisor position to discrimination:

> Q  Do you believe that PDHP discriminated against you by eliminating that position which you have just referred to?
> A  I can't speak to what the rationale was for them not having someone work in that school.
> ....

> Q Do you believe that PDHP discriminated against you by eliminating the position you just referred to?
> A I am not sure if it was part of their discrimination against me.
> Q So your answer is no?
> MR. BERANBAUM: Objection.
> A My answer is, I'm not sure. I'm sorry.

At 456:7-25; 457:1-25; 458:1-25; 459:1-25; 460:1-7, Dwyer explains Plaintiff's Organizational Charts [Plaintiff's Exhibits 89 and 90] the removal of the RY Supervisor position from the PDHP organizational chart. Exhibit 89 is the Organizational chart for the 03/04 School year which indicates the Babolcsay position existed. Exhibit 90 is the 04/05 organizational chart indicating the Babolcsay position no longer existed.

At 460:6-17, Dwyer testifies that the RY Program ceased to operate at Christ the King following Babolcsay's resignation in accordance with the School's wishes. At 969:5-16, McEvoy testified that when she met with the Christ the King Principal the Monday after the Bablocsay incident, she was informed by the School that it did not want the RY program at the School and that Christ the King High School ended the RY program at its school:

> Q Did the RY program at Christ The king operate in the 2004-2005 school year?
> A No, it did not.
> Q Did it operate there at any time after 2004-2005?
> MR. BERANBAUM: At Christ The King?
> THE WITNESS: Oh, Christ The King.
> MR. BERANBAUM: I don't think you said that.
> MR. MONTE: I did.
> Q Were you at Christ The King?
> A At Christ The King, no. **The principal really just did not want us to. He did not want to do this. He didn't want the RY program at this point.** [Emphasis added]

6

Thus it is clear that the Christ the King determined that the position was no longer going to exist before Plaintiff ever applied for it. There can be no other reasonable conclusion because when McEvoy attended the meeting with the principal there was no action yet taken to discharge Babalcsay. At 462:14-25; 463:1-5, Dwyer testifies that decision to terminate the RY Supervisor position was made prior to speaking with the Plaintiff about it is consistent with the above testimony by McEvoy. At 726:20-22, on cross examination by Plaintiff's counsel, Dwyer reiterates that no one was given Babolcsay's RY Supervisor position. Such is empirically established by the above stated organizational charts [exhibits 89 and 90]

At 452:12-19, Dwyer explains in detail the elimination of the RY Supervisor position:

> Q Was the position subsequently eliminated from your budget?
> A What I did was I kept Ellen in that budget and since I was no longer paying a full salary that I was paying for Linda Babolcsay, I was able to move - on OASAS's recommendation theysaid I could do this - move Sonia McAuley's salary 50 percent into the RY budgets and keep the rest of her salary in the OASAS budget, which then freed up some OASAS money.

It is true that PDHP was considering eliminating the position before the above stated meeting and before Plaintiff sought the position. At 434:13-25; 435:1-8, 958:7-25; 959:1-25 960:1-3, 510:19-25; 511:1-9, the Defendant's Executive Director testified that prior to Babolcsay's resignation; she had considered eliminating the RY Supervisor position. At 450:17-21 and 451:9-25; 452 1-13, Dwyer testifies that no replacement for Babolcsay as RY Supervisor was hired and that the position's workload was redistributed. While it is admitted that the Defendant's actions before the discharge of Babolcsay standing alone are insufficient to warrant vacating the jury verdict, the simple uncontested fact is that Christ the King H.S. determined the position was being eliminated before Plaintiff either applied for it or was aware that Babolcsay

7

might lose her job is dispositive of the issue. Simply stated, it is a fact that no position existed prior to Plaintiff's alleged application.

Dwyer's testimony was totally consistent with such as she repeated, on cross examination, that no one was given the Babolcsay position. 726:23-25; 727:1; 730:22-25; 731:1-6. At 111:7-13, Sonia McAuley confirmed that the RY program at Christ the King High School discontinued after Linda Babolcsay left:

> Q   Do you recall if there was a program at Christ the King in 2004?
> A   That was where Linda Babolcsay had worked and after she left that group, RY group discontinued there.
> Q   Is that RY group discontinued there?
> A   Yes. They were not doing the RY Program in Christ the King after Linda Babolcsay left.

**3. Plaintiff admitted that the position of RY Supervisor at Christ the King High School did not exist at the time of Plaintiff's demand for same.**

At numerous points in her direct testimony that the RY Supervisor position ceased to exist at the time of her interest in it.

At 313:24-25; 314:1-13, Plaintiff admitted that all existing RY positions were filled for the 2004-2005 school year:

> Q   Starting 2004-2005 year did each of those schools' programs have a person in place running though programs?
> A   Yes.
> Q   How many schools had programs --RY programs in 2003-2004?
> A   There was one more.
> Q   And which was that?
> A   Christ The King High School.
> Q   And who ran that program?
> A   Linda Babolcsay.
> Q   Is it fair to say that that program seized when Linda Babolcsay left?

> A   PDHP made the decision when she left not to replace her in that school.
> Q   So there was no program in Christ The King 2004-2005?
> A   They discontinued that.

At 307:22-25, Plaintiff conceded there was no obligation on Defendant's part to maintain the RY Supervisor position because Plaintiff had an illness:

> Q   Do you believe PDHP was required to maintain Linda Babolcsay's position in Christ the King because you had an illness?
> A   No.

At 337:5-8, Plaintiff admitted that the Executive Director of PDHP did not tell her the Babolcsay position was open:

> Q   Did Eileen Dwyer tell you a position was open – that Linda Babolcsay's position was open and she was seeking replacement?
> A   No.

The documented restriction on RY locations to place a new RY staffer at the time of Plaintiff's demand for promotion cannot be dismissed as a minor logistical matter. Plaintiff applied for the post at Christ the King High School which had been eliminated at the school's request. At the time of Plaintiff's demand, there were literally no RY locations to place her in. At 375:3-25; 376:1-10, even Plaintiff admitted that there were no available RY positions at the time she requested a promotion:

> Q   Had you been given Linda Babolcsay's position for the '04-'05 school year, did you expect to be work at Saint Joseph's High School?
> A   No.
> Q   Did you expect to be working at Holy Cross High School?
> A   No. I wouldn't think so.
> Q   Did you expect to be working at Bishop Ford High School?
> A   I wouldn't think so.
> Q   Okay.
> A   I don't know.

9

> Q       Did you expect to be working at Catherine McAuley High School?
> A       I don't know. No, I guess.
> Q       Other than Ellen Fitzpatrick, did any of the other RY personnel during that year work full-time for PDHP that year, being '04-'05?
> A       I'm sorry. Can you repeat the question?
> Q       Sure. Other than Ellen Fitzpatrick during the '04-'05 school year, did any of the other RY personnel work full-time for PDHP?
> A       I don't believe so.
> Q       Were those personnel called the facilitators?
> A       RY counselor? Interchangeable, counselor, facilitator.
> Q       RY counselor and RY facilitator is --
> A       To my understanding.
> Q       -- interchangeable?
> A       To my understanding.
> Q       Was it your intention to become an RY counselor in '04-'05 school year?
> A       It was not the position I was applying for.
> Q       So is that no?
> A       That would be no.

At 407:1-6, on further redirect examination by her own counsel, the Plaintiff read documentary evidence that Ellen Fitzpatrick received "additional responsibilities in the RY Program", **not** a promotion to RY Supervisor:

> Q       Would you please read to the jury what it says?
> A       It says that "As of September 1, 2004, Ellen Fitzpatrick's salary is $39,698. This reflects an increase in job responsibilities in the RY program. Please make the change and pay her retroactive to September 1. Let me know what pay period she will see this in. Thanks."

At 411:20-25; 412:1-9, on re-cross examination, the Plaintiff admitted that the alleged written "evidence" of Ellen Fitzpatrick's "promotion" (Plaintiff's Trial Exhibit 83) fails to identify either a promotion or a supervisor position:

> Q       Can you read the paragraph that appears on that page?
> A       Yes. "As of September 1, 2004, Ellen Fitzpatrick's salary is $39,698. This reflects an increase in job responsibilities in the RY

10

program. Please make the change and pay her retroactive from September 1. Let me know what pay period this will start in. Thanks."
Q   Does this memo talk about a promotion? Withdrawn? Does the word "promotion" appear in this memo.
A   The word "promotion" does not appear in this memo.
Q   Does the word "supervisor" appear in this memo?
A   No, it does not appear in the memo.

At 460:8-25; 461:1-3, Eileen Dwyer – Executive Director for the defendant - confirmed that there were no vacancies in the RY program in 2004-2005 despite Plaintiff's demand for promotion. At 463:15-24, Dwyer testified that she explicitly told the Plaintiff that there was no position:

Q   And did you discuss this position?
A   I asked that -- she asked to see me and I said we could meet. I had a few other appointments and phone calls I had to make, and I said we could meet later. And she came in and said, "I want to talk about the position." And I said, "Which position, because there is no position available?" I had never posted it. It was not available. And she said she had heard that Ellen got the position, and I said Ellen did not get the position. I did not -- I eliminated the position and redistributed the workload.

At 518:6-10, on direct examination by Plaintiff's counsel, Judith Schiller-Rabi testifies that the RY Supervisor position had been reconstituted and not given to Ellen Fitzpatrick:

Q   Well, is it a fact that Ellen Fitzpatrick was getting a supervisor job at that point?
A   No. The position had been reconstituted. It was no longer the same -- it was no longer the position that Liz obviously had held.

At 848:18-25; 849:1, on direct examination by Plaintiff's counsel, Fitzpatrick admits she was not performing the same job responsibilities that Linda Babolcsay had previously, thus

11

refuting Plaintiff's allegation that Fitzpatrick had been given Linda Babolcsay's vacated position:

> Q    Were your job responsibilities, as RY supervisor in 2004 and 2005, the same job responsibilities that Linda Babolcsay had the previous year?
> A    No.
> Q    What were the differences?
> A    I didn't attend administrative meetings, and if there was a crisis where a student was suicidal, the part-time RY staff would report to me, but then I would have to report it to Sonia for guidance.

### 4. Plaintiff did not apply for a theoretical RY Supervisor position at Mary Louis Academy or for Sonia McAuley's position.

Much time is spent in arguing that an alternative accommodation could have been made – namely, her theory that the RY Supervisor position could have been reinstituted in its prior form at The Mary Louis Academy. Plaintiff also testified regarding a novel argument that Sonia McAuley had been given the RY Supervisor position at Christ the Kings High School which had been vacated by Linda Babolcsay. Respectfully, neither of these contentions is raised in Plaintiff's Complaint, and clearly neither is addressed in the Jury Verdict Form, Item 3. Although Plaintiff's exhausting coverage of both contentions may have produced confusion among the jurors, it is clear that neither contention can establish that the RY Supervisor position at Christ the King High School existed following the June 9, 2004 decision by the Executive Director to eliminate the position.

At 313:2-7, Plaintiff admits that an RY program at TMLA was "a suggestion" rather than the object of a request for accommodation or application for promotion:

> Q    Is it your believe[sic] that PDHP should have started an RY Program at Mary Louis in 2004-2005 school year?

12

> A   My suggestion was that they could have started a program at Mary Louis Academy, and when Eileen Dwyer asked me or suggested that Sister Kathleen would not want the program I said that I thought she would if asked.

At 324:3-14, when confronted with the question of whether the RY Supervisor position existed and where it would be performed, the Plaintiff retreated from her position as stated in her complaint to a purely conjectural argument:

> Q   If you had received the position of RY supervisor where do you expect you would have been working in 2004-2005?
> A   There's several options that could have -- courses of action they could have taken.
> Q   Where do you think you would have been?
> A   They could have had me working at Mary Louis Academy.
> Q   Was there a program at Mary Louis Academy?
> A   There was not. There was not a program for RY at any school until they added the program of RY to a school. So it is something that we do at PDHP -- offer a new service, see if the school is interested and bring the service to the school. (322:9-19)
> ...
> Q   Sorry. You stated earlier there were four schools that RY was operating in, in 2004-2005; correct?
> A   Yes.
> Q   And was Mary Louis one of those schools?
> A   Not at that time.
> Q   But you stated that you could have worked at Mary Louis in an RY Program?
> A   They could have added the program to the Mary Louis Academy.
> Q   They could have added the program?
> A   Sure, in the same way they took it away from Christ the King.
> Q   Did they take it away from Christ the king?
> A   We just said when Linda left the program was discontinued at Christ the King.

At 325:8-25; 326:1-25; 327:1-8, the Plaintiff admits that (a) she did not believe that PDHP was obligated to create a program to accommodate her request for promotion; (b) that the decision was Eileen Dwyer's (no one else, regardless of who the Plaintiff spoke to about being

13

promoted); and (c) that Eileen had expressed no intention of opening an RY program at TMLA at the time of the PDHP retreat on June 23, 2004:

> Q   Do you believe PDHD was required to create a program at Mary Louis to move you into because you had an illness?
> A   Required?
> Q   Required.
> A   Because I had an illness to create a program in a school, are you asking me because of my illness?
> Q   That is the question.
> A   PDHD was required to create a program because of my illness, of course not.
> Q   So where do you believe PDHP could have moved you for 2004-2005 school year?
> MR. BERANBAUM: Objection.
> THE COURT: No, I will allow it. Go ahead.
> A   Having worked at PDHP 16 years I saw that many times programs are done differently and different setups are made. The goal of PDHP is to provide as much service as you can to the students of different schools in the Catholic schools in Brooklyn and Queens. When Linda left I was not surprised that Christ the King did not want her replaced because they had negative experience with her. However, when I met with Eileen and we went through the back and forth if I was overqualified and under-qualified and all the rest, and she suggested in final desperation Christ the King doesn't want the program, we don't have a school for you. I said -- and she suggested that the Mary Louis Academy wouldn't want that program. I said what makes you think Mary Louis Academy wouldn't want this program. The opportunity to have a program to meet the needs of high risk students in their school? Why wouldn't they want that program? I would think they would, and the opportunity to keep me as their school counselor, perhaps losing me to another school because they have do have the RY Program, I think she would want that. In my mind that was one option, but there were other options also.
> Q   Whose decision would it have been to create an RY program in Mary Louis?
> A   It would have been Eileen Dwyer's decision and the school would have had to agree to have a program in the school.
> Q   Did she state an intention to do so?
> THE COURT: "She" being?
> MR. BERANBAUM: Objection.
> Q   Did Eileen Dwyer state an intention to open an RY Program at Mary Louis?

14

> A When we had that discussion she said she didn't believe Mary Louis would want that program in that school. So my response to her was that I felt that they would want that program.
> Q Did you take that to mean she intended to open an RY Program?
> A No.
> Q At Mary Louis?
> A No, absolutely not. No, I did not.

The entire argument that the RY Supervisor position could have been reconstituted at Mary Louis Academy is, in fact, moot inasmuch as Plaintiff *never* raised the idea until the June 23rd retreat – a full two weeks after the decision had been made to eliminate the position. At 327:19-25, Plaintiff admits there had been no discussion of creating an RY Program at TMLA prior to Plaintiff's request for promotion:

> Q Had you discussed the possibility of opening an RY Program at Mary Louis prior to the conversation you had with Eileen Dwyer about Linda's job?
> A Certainly not.
> Q To your knowledge, were there any concrete plans to open an RY Program at Mary Mary(sic) Louis?
> A There were not.

At 400:15-24, on her own counsel's redirect questioning, Plaintiff now incredibly alleges that she requested the position that belonged to her supervisor, Sonia McAuley:

> Q My question to you is knowing what Sonia McAuley's responsibilities were, supervisor of Ellen Fitzpatrick in the RY program, were you qualified to do that job?
> A Absolutely.
> Q Why?
> A Because I had my master's degree. I had 18 years of social work experience, 16 years of PDHP. I had done individual therapy for 16 years, group therapy for at least 15 of those 16 years. I had excessive training. Yes, I felt very well equipped to supervise people in this line of work.

Again, these are not positions which the Plaintiff ever alleged in her Complaint (Exhibit "A" at paras. 20, 21, 26, 27, 28, 30, 32, and 34) she was denied: They are alternative ideas that were not even conceived at the time of Plaintiff's request for promotion. It is pure conjecture and served only to confuse the jury into believing that the RY Supervisor position that had been held by Linda Babolcsay and operated out of Christ the King High School existed at the time of Plaintiff's demand to be promoted. Such conjecture is not admissible evidence.

At 1010:18-25; 1011:1-19, Plaintiff's counsel abandoned HIS argument regarding Linda Babolcsay's position and bean a line of questioning regarding Sonia McAuley's position (again, notable as Plaintiff has not complained of having applied for and been denied Sonia McAuley's position):

> Q     Was there ever any discussion that you were aware of of[sic]putting Ms. Siracuse in the position that Ms. McAuley was to assume?
> A     No, because Ms. McAuley was the regional coordinator at the time.
> Q     Correct me if I'm wrong, but Ms. McAuley had never participated in the RY program?
> A     She had the training. She was present when we all had the training.
> Q     That was two-day training?
> A     It was a two-day training by the authors of the program, yes.
> Q     You think Liz who we all agree was energetic, a bright person could have figured out a way of understanding whatever lessons were imparted in 1999?
> MR. MONTE: Objection.
> THE COURT: Rephrase.
> Q     Did you think it was -- withdrawn. It would have been a major obstacle to putting Ms. Siracuse in the position that you were slotting for Sonia McAuley because she didn't go to a two-day training in 1999?
> A     I'm not understanding this because Sonia McAuley had a job. She had it for a number of years as a regional coordinator and this was just -- her supervision was just being given to her of the

supervision of Ellen. There wouldn't have been any question of
why Liz would have Sonia McAuley's job. I don't get that.

No evidence admitted at trial tends to document the existence of the RY Supervisor position that the plaintiff applied for at any relevant time. In fact, both Plaintiff and Defendant introduced numerous documents entered into evidence at trial which established that the RY Supervisor position did not exist at the time of Plaintiff's demand. Key items of evidence along these lines include:

| | |
|---|---|
| Plaintiff's Exhibit 117: | Establishes that Ellen Fitzpatrick did not receive a promotion and was not made RY Supervisor. |
| Plaintiff's Exhibit 83: | Establishes that Ellen Fitzpatrick did not receive a promotion and was not made RY Supervisor. |
| Defendant's Exhibit ZZZ: | Establishes that all open positions sought to be filled within the Defendant agency during Eileen Dwyer's tenure as Executive Director for were announced in writing - which Plaintiff admits did not happen as regards the RY Supervisor position. |
| Plaintiff's Exhibit 89: | Establishes that the position of RY Supervisor existed while filled by Linda Babolcsay during the 2003-2004 academic year. |
| Plaintiff's Exhibit 90: | Establishes that the position of RY Supervisor no longer existed during the 2004-2005 academic year. |
| Plaintiff's Exhibit 86: | Plaintiff's attempt to establish that the RY Supervisor position existed as late as June 2006. However, this was discredited in testimony as not having been authorized by the Defendant; by Ellen Fitzpatrick's admission that the title of RY Supervisor "gave the recommendation weight", and by the absence of Defendant's authorized letterhead. |
| Plaintiff's Exhibit 120: | Establishes that the written announcement of Linda Babolcsay's resignation was not accompanied by a solicitation for applications to replace her, as had been the unbroken routine as established by Defendant's Exhibit ZZZ. |

All the foregoing establishes that the Plaintiff has provided no evidence that that would support her contention that the position of RY Supervisor existed at the time she demanded

17

same. Facing a very similar fact pattern, the Southern District held in Singh v. N.Y. Off-Track Betting Corp., 2005 U.S. Dist. LEXIS 11098 (SDNY 2005):

> The defendant has demonstrated that its decision not to promote the plaintiff was based upon the fact that it eliminated the position of SVBS because it was no longer necessary. The plaintiff has provided no evidence that the elimination of the SVBS position was mere pretext for discrimination.

In response to Defendant's overwhelming showing that the RY Supervisor position no longer existed as constituted at the time Linda Babolcsay resigned and in the form that the Plaintiff alleges she applied for, Plaintiff has failed to produce any credible evidence that the position did exist as alleged in her Complaint. The non-moving party must produce evidence in the record and may not rely simply on conclusory statements. See, Echeverria v. Krystie Manor, LP, 2009 U.S. Dist. LEXIS 27353 (EDNY 2009) The Plaintiff has entirely failed to rebut Defendant's showing that no RY Supervisor position existed at the time Plaintiff allegedly applied for same. As such, there is no evidentiary basis for a reasonable jury to find that such a position existed at that time. Accordingly, Defendant respectfully moves this Court to set aside the jury's finding on item number 3 on the Jury Verdict form and therefore dismiss Plaintiff's cause of action under the New York City Human Rights Law.

## CONCLUSION

## THE JUDGMENT OF THE JURY SHOULD BE SET ASIDE.

Dated: Brooklyn, New York
June 13, 2011

Respectfully submitted,

_____
Marc J. Monte, Esq. (MM0463)
Richard J. Cea, Esq. (RC-6301)
Wingate, Kearney & Cullen, LLP
*Attorneys for Defendant*
45 Main Street, Suite 1020
Brooklyn, New York 11201
Tel. 718-852-5900